Case No. 18 at 1247 NL, Con-Way Freight, Inc. Petitioner, National Recreation Corps. Mr. Bradford, Petitioner. Mr. Nixon, please respond. Good morning. Do I have that right? D'Heidelberg. D'Heidelberg, thank you. Good morning, and may it please the Court, Joshua D'Heidelberg appearing for Con-Way. I'm going to focus my presentation on the situations involving Mr. Romero and the implied threat of violence by Mr. Camarena. The Board is not entitled to deference in this case because its conclusions are not based on substantial evidence in the record adequately considering opposing record, excuse me, opposing evidence in the record as a whole, and also not following its precedent and the Court's. With respect to Mr. Romero, Con-Way's national safety program is designed to prevent future accidents. It focuses on the preventability of accidents. And Mr. Romero is ultimately discharged when, in an investigation where he's being shown drive cam video, he does not accept even partial responsibility or agree that he was distracted in any way by manipulating an electronic device about a second while he's careening down the highway being passed by another tractor trailer. He shows no self-awareness or any recognition that this is in any way improper, contrary to company policy, indeed unlawful in California. This Court's precedent holds that if an employer acts based upon reasonable business judgment, then it hasn't engaged in discrimination under the NRA. And Con-Way's actions here are at least minimally reasonable. The Board does not contest that the drive cam video showed that, indeed, he was manipulating an electronic device a second before the accident occurred, or that he was veering into another lane, whereas he, in his accident reports, at least four times, including the hearing, denies any culpability in any respect. You just characterized it as undisputed that he was veering into another lane. I thought that nobody was contending that he was actually veering into another lane, that the other truck had reached the outside of its line, and that the issue was whether he was veering closer to that side of his lane. Yes, he was veering closer. Okay, that was a very much contested issue, so I want to make sure you're working on it. The issue, again, is preventability and distraction in terms of the company's policies. Understood. From the outset, in Respondent 20, for example, the initial email from Mr. Anderson, the safety manager, is that the two trucks are veering towards each other. Getting close to one another. Right, and he is not disclosing to the company that he has an electronic device and that he's veering. The problem I'm having with the argument that you're making is that the reason for the firing was falsification. Yes. It wasn't that he didn't comply with company policy with respect to handheld devices. It was that he falsified the report. And what the board found was that in the context, that was pretextual because the alleged falsity wasn't really false or materially false. So it seems like you're trying to kind of reconstruct the analysis here. I'm not attempting to do that, Your Honor. I'm simply just highlighting the fact that in an investigation, he was given a fair opportunity to explain himself, and he didn't waver from that position. It's undisputed. I mean, the board does not contest that falsification under the company's policies includes material omissions and accident reports. So I thought he did acknowledge that he was using an iPod. And indeed, he turned on the camera. He pulled over and called right away. So this idea that he's not acknowledging and taking responsibility, I thought he did. In his initial accident report, he does not mention the iPod. In his report to the safety department, he does not mention the iPod. And that's the falsification for which he was terminated. With respect to turning on the camera, if you look at pages 64 and 65 of the joint appendix, it's clear that this is not an issue of honesty. He doesn't know what he's done when the accident occurs. He doesn't know what the damage is. He knows it was an accident. And under the company's policy, under policy 811, which is in the joint appendix, it's also a disciplinary event to fail to report an accident. So there's no honesty involved because he doesn't know what's happened at the time that he turns on the camera, what the degree of damage is. At the time that he turns on the camera. I'm not sure where that takes you. Well, you had indicated that he was somehow honest in saving the DriveCam video. What I want to point out, at the time that he saves the DriveCam video, he doesn't know the degree of the accident. If he comes back to the facility and doesn't report an accident, that is also, you know, a cause for discipline. So there's no honesty involved. He's following policy. Right. You had characterized him as not taking responsibility for his actions, and it just struck me that there was some taking of responsibility. So I wanted to clarify with that in its context. Well, they have what I would call a layered safety program, which is that they place a great deal of emphasis on accurate reporting of an accident in these reports to the safety department because they don't have a situation where supervisors are riding along with drivers. They don't have people, you know, watching DriveCam in real time. Yes. Can you provide, are there other examples? One of the things Conway relies on is a lot of the comparator evidence. Yes. Is there, is there other, are there other circumstances where a driver has been fired for this similar type of falsification? There are. One of the themes of the problem with what the board did here is that they don't adequately address and grapple with the comparator evidence. Instead, they use pretext as an excuse to not grapple with it. The undisputed, unrebutted evidence in the record is that the company consistently discharges for similar falsifications. That evidence is unchallenged in the record. What's your closest comparator that you would have us, or name one or two or three, that you would have us look to closest to Romero in terms of misconduct and consequent? Well, you know, it's all of the ones in 26, but 26I, for example, is a situation which shows that he was treated even more favorably, Mr. Romero was, than another driver. Because in that situation, I think it's Mr. Wellis, he admits that he did cause an accident at a later stage in the investigation, and they still terminate him. And what of the argument by the juvenile counsel that we don't have jurisdiction to hear of this argument that you're making? This is not a 10E situation. I mean, conceptually, in many ways, this is sort of a garden variety discrimination case under board law. And as we point out in our brief, I mean, not only that, in our exceptions, we raise arguments of reasonability, and indeed it's an affirmative defense of the company to cite the reasonableness of its actions. I was wondering if I could take, I see my light is on, a minute to discuss the situation involving Mr. Placencia and Mr. Camarena. This is one of those unusual situations in which the board has engaged in, you know, self-contradictory credibility determinations. There is a discussion involving three people. The board on pages 611 and 612 of the appendix credit Mr. Rosado, where there are credibility disputes between Mr. Camarena and Mr. Placencia. If you take a look at pages 148 of the record, and also 212 to 218, and 428, which is general counsel seven, it's very clear that there is only one conversation dealing with the battered wives knock the doors down exchange. The board's findings are premised entirely on its belief that there are two conversations, one that occurs when Mr. Rosado has left for about seven or eight minutes. But if you take a look at this evidence, it's very clear that right at the end of the conversation, which is at issue where the statements that Mr. Placencia is claiming occurred, he asks Mr. Rosado, can I go now? Am I done now? You know, it's immediate, it's clearly right at the end of the conversation. And Mr. Rosado supports Mr. Camarena's version of events, which the board credits without exception. Thank you. Good morning, Mr. Hickson. Good morning, Your Honors. May it please the Court. Michael Hickson for the NLRB. I'd like to focus on the 883 discharge of Mr. Romero, the 24-year employee who led the union's organizing efforts at the facility. And if I could, I'd like to jump in on a few points that were raised during my friend's presentation. I think it's important to step back, as I believe Judge Wilkins mentioned, and appreciate the import of the fact that the company has never said that Mr. Romero was suspended or discharged because he drived in an unsafe manner. In fact, if you look at appendix page 351 and 352, there's undisputed testimony from Mr. Tuner that if Mr. Romero would have taken his responsibility for the accident and if the falsification issue had not been in play, that the only consequence of his actions in the truck would have been a point assessed and a nondisciplinary coaching. So this isn't about safety, it's about the claim of falsification. Additionally, there was some discussion about whether anyone ever said that Mr. Romero veered out of his lane. I think that's important, and it's an important part of the evidence that supports the Board's finding of pretext. While it's true that the company, in its final accident report and in its disciplinary documents, took the position that Mr. Romero merely drifted to the far right of his lane while the other truck drifted toward him, and then there was contact made between the two trucks, Mr. Anderson, in his testimony at the hearing, offered a very different picture and said that Mr. Romero was veered over into the other lane or crossed over the line into the other lane and struck the other vehicle, whereas vehicle two did not hit Mr. Romero. So that's in sharp contrast with the company's own disciplinary documents, and it's also at odds with the evidence in the record that there's no way to tell, in fact, by looking at this video, where Mr. Romero's truck was located in his lane. And Mr. Anderson admitted to that at Appendix Page 335. Let's see. In discussing the point about Mr. Romero's acknowledgement, I just want to clarify, following up on that discussion, that when Mr. Romero was interviewed, I guess, they had the conversation on August 20th involving Mr. Anderson, Mr. Swires, Mr. LeCun, and Mr. Romero. He did, in fact, acknowledge at that time that he was holding an iPod and that he had touched it to change the song. Let's see. Regarding the comparator evidence, the board didn't refuse to consider that evidence. The board considered it and properly determined that it was not applicable in this circumstance. And I think there's a few reasons. First, as the board found, with respect to the decision to investigate, these other employees, the employees, presumably, were investigated for a legitimate, good-faith reason. And I guess, if I could back up for a minute, maybe I should have said this before. There's no, it's undisputed that the company does not investigate every reported accident that occurs on the road with its trucks. And the company put no evidence in the record. I think this is also undisputed, though my friend can correct me if he thinks that's wrong. I think it's also undisputed that the company put forth no evidence and has never suggested that it has any established criteria or policy or guidelines that determine when it does or does not decide to investigate. Well, but they did put forward evidence of many different comparable situations where they have conducted such investigations and where they have discharged people for falsification. They did, Your Honor, but, well, I wouldn't agree they're comparable, I guess, in the end. They put forth evidence that there were other people whom they investigated where they determined there was falsification and where they eventually discharged those people. But the board's finding, reasonable, is that they're not actually comparable. And they're not comparable with respect to the decision to investigate because those employees, presumably, were the company, you know, the company makes selective choices about which accidents it investigates. Those employees, presumably, were investigated for legitimate good faith reasons. Whereas the board found that the reason given for the decision to investigate Mr. Romero's accident was pretextual. Well, what's the evidence that supports that, where you have so many comparable investigations? Well, but, Your Honor, the number of investigations I really don't think is so impressive when, you know, there's so many comparable investigations. The company isn't comparing that against the number of reported accidents. I mean, but the general counsel here has the burden of proof, right, to show that there was animus. Well, I'm not sure, Your Honor, so, Your Honor, I'm not sure the general counsel has the burden of proof on this exact point because the board based its finding that Mr. Romero's protected activity was a motivating factor in the adverse actions on other grounds, and that's true, if you'd like, but if I could make one other point, if I may, the, again, so-called comparators are also not really comparators when you're considering the eventual discharge decision because the board looked at ample evidence on the record and decided that there were several bases to demonstrate that the company's purported falsification rationale was a pretext and that the company, in fact, did not rely on that rationale. So the fact that they can point to 12 other employees out of who knows how many accident reports and how many videos, actually, there is some evidence in the record about how many there are, and there's quite a lot, which I could go into if you'd like, the fact that they can point to some other people where they discharged them when they did rely on that rationale is really of no moment when and there's these several reasonable bases for the board to conclude that here they did not rely on that rationale. Can you talk about the finding about threatening conduct and the detailed presentation that Mr. Dietlberg made about how there really was only one conversation and that the board seems to have found that there were two and that that's contradicted by the record because it has been found that there were two witnesses, crediting and discrediting the testimony of the same witness. I don't think that, well, so sure, Your Honor, let me respond. I don't think there's any dispute, actually, that it's one conversation. In fact, it's a very drawn-out conversation. Mr. Rosado estimated that the conversation took place over the course of about 30 minutes. So the exhibit that my friend is referring to where Mr., I'm sorry, I'm mixing up names, Mr. Plascencia. He described the conversation and his testimony describing the conversation, and really everyone's testimony describing the conversation, is not a minute-by-minute, blow-by-blow account of everything that was said in this approximately 30-minute-long conversation. It was a summary of what they recalled. And it's undisputed, well, yes, it is undisputed, that Mr. Rosado testified that he was not present for seven to eight minutes. He testified in the testimony that, yeah, while I was around, I didn't see Mr. Camarena do any of those things. That simply does not resolve the conflict in the testimony between Mr. Plascencia, who said Camarena did it, and Mr. Camarena, who said I didn't do it. That conflict in the testimony needed to be resolved. It could not be resolved by Mr. Rosado because he was not present for seven to eight minutes. And as the judge found well-detailed in her decision and affirmed by the board, Mr. Camarena showed himself to be an evasive and at times, blatantly dishonest witness. And, you know, the reason she gave, she even highlighted specific testimony in his evidence, in, excuse me, specific testimony in her decision, where he showed himself to be evasive and contradictory, and thus properly credited the testimony of Mr. Rosado. And I think that's what we're going to have to deal with in the case of Mr. Plascencia. Thank you, Your Honor. Mr. Dunlap, you can have a couple of minutes. Just very briefly on the situation involving Mr. Plascencia, I think any fair reading of the evidence is clear that Mr. Plascencia is not present when the alleged threat was made. And I think if you look at that, those portions of the record that I've cited, it will show that. With respect to Mr. Romero, the board has undertaken an analysis of the comparators general counsel has, which the board didn't actually do in its decision. If you take a look at footnote 18 of the board decision, they indicate that the company's explanation is implausible, that Mr. Plascencia's explanation is implausible, that they acted solely on the basis of a discriminatory motive, when their own comparators show plausibility, the fact that they didn't do so. The unrebutted evidence in the record at pages 267 and page 331 is that it was that Mr. Wautier had on a number of occasions asked to have, you know, whether someone veered out of the lane verified through drive cam. And that's completely unrebutted, as Chairman Ring points out in his dissent. This is not a fruit of the poisonous tree situation, because the company has shown that it acted routinely to investigate this matter. And then he was, you know, again, falsification is critical in their safety program, because they need to rely upon honest accident reports, which they didn't get in this circumstance. Thank you.
judges: Pillard, Wilkins, Rao